IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sherry Collins, on behalf of Arlen Lester Collins, deceased, | ) ) ) | C/A No.: 1:16-2929-RMG-SVH |
| Plaintiff, | ) ) | |
| vs. | ) ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security Administration, | ) ) ) | |
| Defendant. | ) ) ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Claimant's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On June 7, 2012, Arlen Lester Collins ("Claimant") protectively filed applications for DIB and SSI in which he alleged his disability began on January 31, 2012. Tr. at 124,

125, 238–44, and 245–46. His applications were denied initially and upon reconsideration. Tr. at 170–74 and 176–82. On December 18, 2014, Claimant had a hearing before Administrative Law Judge ("ALJ") Jerry W. Peace. Tr. at 49–88 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 10, 2015, finding that Claimant was not disabled within the meaning of the Act. Tr. at 25–48. On March 19, 2015, Claimant requested that the Appeals Council review the ALJ's decision. Tr. at 20–24.

Claimant passed away on June 6, 2015.[1] Tr. at 254. His wife, Sherry Collins ("Plaintiff"), properly filed a substitution form and indicated she desired to proceed with the case. Tr. at 18. Subsequently, the Appeals Council denied Claimant's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 25, 2016. [ECF No. 1].

B.     Claimant's Background and Medical History

1.     Background

Claimant was 48 years old at the time of the hearing. Tr. at 57. He completed high school and truck driving school. *Id.* His past relevant work ("PRW") was as a meat cutter and a stocker. Tr. at 80. He alleged he had been unable to work since January 31, 2012. Tr. at 238 and 245.

---

[1] A death certificate indicates "PENDING TOXICOLOGY" under "CAUSE OF DEATH." Tr. at 254. The record does not contain a toxicology report or clarify Claimant's cause of death.

2.      Medical History

Claimant presented to the emergency room ("ER") at Oconee Medical Center ("OMC") on December 8, 2011. Tr. at 374. He reported dizziness and stated he felt like he was going to "black out" every time he stood. Tr. at 374 and 375. The attending physician diagnosed benign positional vertigo and administered Antivert. Tr. at 377. Claimant's symptoms improved, and the attending physician discharged him with a prescription for Meclizine. *Id.*

Claimant presented to the ER at OMC on May 9, 2012, and reported a month-long history of diarrhea and abdominal cramping. Tr. at 381. The attending physician discharged Claimant with instructions to collect a stool sample and to return it to the lab for analysis. Tr. at 384.

On May 25, 2012, Claimant presented to Sena S. Morris, FNP ("Ms. Morris"), for a nervous stomach and diarrhea. Tr. at 464. He reported anxiety with persistent worry; unrealistic fear of disease; fear of losing self-control; chest pain or discomfort; choking or smothering sensations; tingling in the hands and feet; muscle tension or jitters; stomach discomfort; frequent urination or diarrhea; and anxiety. *Id.* He indicated he felt abdominal cramping and an urge to defecate any time he felt nervous. *Id.* Ms. Morris assessed anxiety disorder, not otherwise specified ("NOS"), diarrhea, social phobia, and depression. Tr. at 465. She prescribed Levsin. *Id.*

Claimant reported severe headaches to Mary K. Reynolds, P.A. ("Ms. Reynolds"), on June 11, 2012. Tr. at 457. He stated the left-sided headaches were accompanied by nausea and exacerbated by noise and light. *Id.* He indicated that his father had died of

brain cancer and that he was worried about dying. *Id.* He endorsed some right upper quadrant abdominal pain and diarrhea. *Id.* Ms. Reynolds assessed classic migraine. Tr. at 458. She referred Claimant for a gallbladder study. *Id.*

Claimant presented to Bradford A. Tyler, M.D. ("Dr. Tyler"), on July 31, 2012, with right upper quadrant abdominal pain. Tr. at 352. A gallbladder ultrasound was normal, but a hepatobiliary iminodiacetic acid ("HIDA") scan showed Claimant to have diminished gallbladder ejection fraction at 22%. Tr. at 353. Dr. Tyler observed Claimant to have right upper quadrant abdominal tenderness. Tr. at 354. He diagnosed cholecystitis and scheduled Claimant for a laparoscopic cholecystectomy. Tr. at 354–55. Dr. Tyler performed the surgery on August 15, 2012. Tr. at 360.

Claimant followed up with Ms. Reynolds on August 27, 2012. Tr. at 447. He reported Dexilant was effective at treating gastroesophageal reflux disease ("GERD") and requested that it be prescribed. Tr. at 448. Ms. Reynolds prescribed Dexilant and advised Claimant to restart Potassium and to use an over-the-counter Nicotine patch. *Id.*

On September 19, 2012, Dr. Tyler indicated Claimant's incisions had fully healed. Tr. at 345. He released Claimant to "full activities without restriction." Tr. at 345.

Claimant complained that his medications were not improving his symptoms on October 29, 2012. Tr. at 441. He reported feeling "very touchy" and "very sensitive" and experiencing chest pain when anxious. *Id.* He indicated his insomnia had improved with medication. *Id.* Lisa A. Arthur-Banning, FNP ("Ms. Arthur-Banning") noted an electrocardiogram ("EKG") was normal. Tr. at 442. She increased Claimant's dosages of

Lisinopril for hypertension and Celexa for depression and referred him to a therapist for panic attacks. Tr. at 442 and 443.

Claimant presented to the ER at OMC on November 3, 2012, for urinary retention. Tr. at 391. His symptoms improved following insertion of a catheter. *Id.* He followed up with Ms. Reynolds for catheter removal on November 5, 2012. Tr. at 439. Ms. Reynolds indicated Trazodone "HAS THE POTENTIAL TO CAUSE URINARY RETENTION" and discontinued the medication. Tr. at 440. She referred Claimant to an urologist. *Id.*

Claimant returned to Ms. Reynolds for a recheck on November 29, 2012. Tr. at 436. He complained that Atarax made him feel too sleepy during the day. *Id.* He indicated his blood pressure had been normal and his urinary symptoms had improved since he discontinued Trazodone. *Id.* He reported early insomnia and decreased libido, energy level, and pleasure level. Tr. at 437. Ms. Reynolds indicated Claimant appeared tired and demonstrated a frustrated, guilty, fearful, anxious, and concerned mood. Tr. at 436–37. However, she observed normal findings with respect to Claimant's level of consciousness, cognitive functioning, grooming, behavior, attitude, affect, and thought processes. *Id.* She provided information regarding anxiety and prescribed Zyprexa. Tr. at 437.

Claimant presented to Ms. Reynolds with nasal discharge, cough, and a sore throat on December 18, 2012. Tr. at 431. He reported Zyprexa was working well, but indicated he continued to have problems with anxiety and irritability. *Id.* Ms. Reynolds diagnosed acute sinusitis and acute bronchitis and indicated she would refer Claimant to a counselor. Tr. at 432.

Claimant presented to Gary D. Cabbage, M. Ed. ("Mr. Cabbage"), on December 20, 2012. Tr. at 471. Mr. Cabbage described Claimant as anxious and depressed. *Id.* He reported that he had become more anxious in public and feared his potential for violent behavior. *Id.* He reported a history of anxiety problems that initially manifested when he was in high school and that had resulted in assault incidents, domestic violence, and arrests. *Id.* Mr. Cabbage observed Claimant to be well-oriented; to deny thoughts of violence; to have some vague evidence of thought disorder; to report bad dreams, night sweats, tearfulness, depressed mood, and periods of severe anxiety; to demonstrate poor eye contact and slow speech; and to have endorsed a history of manic behavior. *Id.* He noted Claimant was very withdrawn, avoided people, and feared his anger could result in violence. *Id.* He recommended Claimant engage in cognitive behavioral therapy and consider a mood stabilizing medication. *Id.*

Claimant presented to Ms. Reynolds to request she complete a disability assessment form on January 8, 2013. Tr. at 425. He indicated he had seen Mr. Cabbage and had been diagnosed with bipolar disorder. *Id.* He complained of increasing anxiety and irritability. *Id.* Ms. Reynolds observed Claimant to have a normal level of consciousness, normal cognitive functioning, and no behavioral abnormalities. Tr. at 429. She stated Claimant appeared tired, but had normal grooming and wore appropriate clothing. *Id.* She indicated Claimant showed guilt and was depressed, fearful, anxious, concerned, somber, and tearful. *Id.* She stated Claimant's thought content and thought processes were not impaired. *Id.* Claimant reported decreased sleep, appetite, libido,

energy level, and pleasure level. *Id.* Ms. Reynolds assessed social phobia, depression, and anxiety disorder, NOS. *Id.* She prescribed Depakote. *Id.*

On January 10, 2013, Claimant reported having nearly been involved in a fight, after being harassed by opposing fans at a professional football game. Tr. at 472. He indicated he had argued with his wife and was afraid she might leave him. *Id.* He stated he had previously enjoyed his interaction with customers on his job, but had begun to fear his temper and access to knives. *Id.* Mr. Cabbage described Claimant as "struggling" and being "very catastrophic in his thinking" and noted that he was having trouble sleeping. *Id.*

On January 16, 2013, Claimant reported some improvement from Depakote. Tr. at 472. Mr. Cabbage observed Claimant to be "[m]ore at ease" and "hopeful that he will be feeling better." *Id.* He indicated Claimant felt "better than he has in some time." *Id.*

On January 17, 2013, Mr. Cabbage completed a mental capacity assessment form. Tr. at 412–14. He indicated Claimant's diagnosis was bipolar I disorder. Tr. at 414. He stated Claimant had a slight degree of limitation with respect to his abilities to remember locations and work-like procedures; to understand and remember very short and simple instructions; to understand and remember detailed instructions; to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. Tr. at 412–14. He indicated Claimant had a moderate degree of

limitation with respect to his abilities to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace with a standard number and length of rest periods; ask simple questions or request assistance; maintain socially-appropriate behavior; and adhere to basic standards of neatness and cleanliness. *Id.* He stated Claimant had a marked degree of limitation in his abilities to work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 413. He wrote "[p]t has just been placed on new medications, has had good response, may eventually be able to work. That has yet to be determined." *Id.*

On January 21, 2013, Claimant complained of swelling in his feet that resulted in pain while walking. Tr. at 420. He indicated he was doing better mentally. *Id.* Ms. Reynolds observed edema in Claimant's bilateral feet and ankles. Tr. at 421. She discontinued Claimant's prescription for Depakote and indicated it may be the source of the edema. *Id.* She prescribed Seroquel for depression and anxiety disorder and Lasix for edema. *Id.*

On January 29, 2013, Claimant reported edema in his feet and difficulty sleeping. Tr. at 418. Ms. Reynolds assessed dyspnea and ordered chest x-rays and pulse oximetry testing. Tr. at 418–19.

Claimant also followed up with Mr. Cabbage on January 29. Tr. at 472. He reported that he had discontinued use of Depakote because it was causing his feet to swell. *Id.* He endorsed additional stress as a result of his son and the son's pregnant girlfriend moving into and out of his house. *Id.* Claimant indicated he was fearful of his moods; had avoided going places; and was afraid of being anxious, down, and explosive. *Id.*

On February 1, 2013, a computed tomography ("CT") scan of Claimant's chest showed bilateral upper lobe emphysematous changes, multifocal subsegmental atelectasis or scarring, a calcified granulomata, a noncalcified right nodule, and small mediastinal and hilar nodes that were numerous, but were within normal size limits. *Id.*

Ms. Reynolds completed a mental status questionnaire on February 14, 2013. Tr. at 483. She stated Claimant's mental diagnoses were depression and bipolar disorder and that medication had been helpful. *Id.* She described Claimant as being oriented to time, person, place, and situation; having a distractible thought process and suspicious thought content; demonstrating a flat mood/affect; having good attention/concentration and memory; and exhibiting only slight work-related limitation in function. *Id.* She stated Claimant was not capable of managing his funds. *Id.*

On April 2, 2013, Claimant reported feeling restless, nervous, anxious, highly irritable, hypersensitive, and depressed. Tr. at 589. He stated he experienced insomnia and had lost interest in activities. *Id.* Ms. Arthur-Banning described Claimant as appearing abnormal, tired, and older than his stated age. Tr. at 590. She indicated Claimant was defensive and demonstrated a dysthymic, empty, frustrated, unhappy,

depressed, anxious, concerned, and irritable mood. *Id.* She prescribed Risperdal and Xanax for bipolar disorder and anxiety. *Id.*

Claimant presented to Ms. Reynolds for medication refills, edema in his feet, anxiety, and emphysema on April 9, 2013. Tr. at 583. He reported feeling better after restarting his medications, but indicated he continued to experience swelling in his feet. *Id.* He stated he desired to return to counseling. *Id.* Ms. Reynolds observed Claimant to have bilateral pitting edema that was worse on the right than the left. Tr. at 584. She again referred Claimant to Mr. Cabbage. *Id.*

On May 6, 2013, Claimant presented to the ER at OMC. Tr. at 503. He complained that his feet had been swelling for the prior two to three months. *Id.* He reported the swelling had worsened over the prior three-week period while had had been out of town and that his feet were oozing yellow liquid. Tr. at 503 and 504. He endorsed numbness in his bilateral lower legs and feet. Tr. at 504. The attending physician observed Claimant to have 3+ edema in his bilateral midcalves, ankles, feet, and toes. *Id.* He noted Claimant had skin lesions over his bilateral legs and feet. *Id.* He removed Claimant's right great toenail and prescribed Lasix. Tr. at 506 and 507.

Claimant presented to David G. Cannon, Ph. D. ("Dr. Cannon"), for a psychological evaluation on May 8, 2013. Tr. at 488. Dr. Cannon observed Claimant to demonstrate a moderately constricted affect and a "possibly depressed" mood. *Id.* He indicated Claimant's speech and appearance were within normal parameters. *Id.* Claimant reported a history of anxiety and depression and stated he burned himself at times. *Id.* He endorsed constant depression that was characterized by a sad mood, hopelessness, and

loss of motivation. *Id.* He attributed his depressive symptoms to his mother's death in June 2009. *Id.* He endorsed constant anxiety characterized by tachycardia, disturbed sleep, general agitation, and fearfulness. Tr. at 489. He reported visual and auditory hallucinations, but Dr. Cannon indicated he did not present as psychotic. *Id.* Dr. Cannon stated Claimant had adequate reality contact, but questionable insight and judgment. *Id.* Although Claimant reported having abstained from alcohol for 10 years, his wife reported that he had used alcohol as recently as six to seven months prior to the appointment. *Id.* Dr. Cannon indicated the discrepancy between Claimant's and his wife's report raised some questions about Claimant's credibility. *Id.* Claimant reported a history of arrests. *Id.* He indicated he had a bad temper and would yell, scream, curse, and throw things when angry. *Id.* Claimant reported a decline in his memory. *Id.* Dr. Cannon indicated Claimant was able to perform serial threes and to recall two out of three items after a four-minute delay. *Id.* Claimant reported having a driver's license, driving an automobile, dressing, bathing, occasionally preparing meals, gardening, doing yard work, doing laundry, performing some household chores, and watching television. *Id.* Dr. Cannon stated Claimant should be able to manage funds effectively, carry out social and daily self-care activities in an independent and sustained fashion, and maintain sufficient concentration and pace to complete tasks in a timely fashion. *Id.* His diagnostic impressions were alcohol dependence, status uncertain; rule out alcohol-induced mood disorder; anxiety disorder, NOS; adjustment disorder with depressed mood; and personality disorder, NOS with borderline traits. Tr. at 489–90.

On May 8, 2013, Claimant complained to Ms. Arthur-Banning that he felt lethargic and was easily tired. Tr. at 574. He reported that he was continuing to experience swelling in his legs. *Id.* Ms. Arthur-Banning indicated she would refer Claimant for an echocardiogram ("echo") and a magnetic resonance angiogram ("MRA") to check for venous problems in his legs. Tr. at 575.

The MRA of Claimant's lower extremities showed small plaques in the abdominal aorta and proximal left posterior tibial artery on May 13, 2013. Tr. at 579. The echo indicated normal size and function of the right and left ventricle, an ejection fraction of 58%, and normal cardiac valves. Tr. at 580–81.

On May 16, 2013, state agency consultant Debra C. Price, Ph. D. ("Dr. Price"), completed a psychiatric review technique form ("PRTF") and considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, 12.08 for personality disorders, and 12.09 for substance addiction disorders. Tr. at 95–97. She determined Claimant had mild restriction of activities of daily living ("ADLs"); moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 96. Dr. Price indicated in a mental residual functional capacity ("RFC") assessment form that Claimant was moderately limited in his abilities to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond

appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; to adhere to basic standards of neatness and cleanliness; and to respond appropriately to changes in the work setting. Tr. at 100–02. She stated Claimant was able to understand and remember simple instructions, but could not understand and remember detailed instructions; was able to carry out short and simple instructions, but not detailed instructions; was able to maintain concentration and attention for periods of at least two hours; would perform best in situations that did not require ongoing interaction with the public; and was able to be aware of normal hazards and take appropriate precautions. Tr. at 102.

Claimant followed up with Ms. Arthur-Banning to review test results on May 22, 2013. Tr. at 569. He complained of feeling tired and lethargic. *Id.* Ms. Arthur-Banning observed Claimant to appear tired; to have a depressed and concerned mood; and to demonstrate a flat affect. Tr. at 570. She noted Claimant had normal consciousness, cognitive functioning, thought processes, thought content, and behavior. *Id.* She indicated she would refer Claimant for further evaluation. *Id.*

On May 22, 2013, state agency medical consultant Carl Anderson, M.D. ("Dr. Anderson"), completed a physical RFC assessment form. Tr. at 98–100. He indicated Claimant could occasionally lift and/or carry 50 pounds; could frequently lift and/or carry 25 pounds; could stand and/or walk for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; should avoid concentrated exposure to

fumes, odors, dust, gases, poor ventilation, etc.; and should avoid concentrated exposure to hazards. *Id.*

Claimant reported that he had recently been falling "a lot" on May 30, 2013. Tr. at 557. He complained of feeling tired or poorly, tiring easily, having chest pain, experiencing dyspnea on exertion, and having regional soft tissue swelling of the lower extremities. *Id.* Edward Booker, M.D. ("Dr. Booker"), assessed an elevated body mass index ("BMI"), intermittent claudication, venous insufficiency, dyspnea, edema, acute chest syndrome, GERD, hypertension, depression, and anxiety disorder, NOS. Tr. at 558. He recommended Claimant lose weight, abstain from smoking, and consult with a cardiologist. *Id.* He referred Claimant for lab work. *Id.*

Claimant presented to the ER at OMC on May 31, 2013, after having sustained a fall while intoxicated. Tr. at 510. He injured his right elbow and hand and left arm. Tr. at 511. Although Claimant reported pain in his back and neck, imaging reports showed no abnormalities. Tr. at 526.

On June 6, 2013, Claimant presented to cardiologist Raza Hassan, M.D. ("Dr. Hassan"), with complaints of chest pain, hypertension, and swelling in his legs. Tr. at 535. He reported smoking two packs of cigarettes per day. *Id.* Dr. Hassan observed Claimant to demonstrate leg edema and to walk with a cane. Tr. at 537. He indicated an EKG was normal. Tr. at 538. He ordered a B-type Natriuretic Peptide ("BNP") test and a Dobutamine Stress Echocardiogram. *Id.* He recommended Claimant undergo a liver evaluation and stop smoking. *Id.*

On June 18, 2013, a Dobutamine stress test showed no chest discomfort, ST-segment changes, arrhythmias, ischemia, or scarring. Tr. at 621. Single photon emission computed tomography ("SPECT") Cardiolite images were normal, and Claimant had an ejection fraction of 70%. Tr. at 621–22.

Claimant presented to OMC for a venous edema evaluation on June 26, 2013. Tr. at 614. He reported swelling and drainage from his bilateral feet and lower legs. *Id.* He stated the symptoms were exacerbated by walking any distance, squatting, and standing. *Id.* The occupational therapist noted that Claimant was walking with a slow gait and demonstrated balance deficits and decreased range of motion ("ROM") in his bilateral ankles. Tr. at 615. She recommended Claimant engage in occupational therapy twice a week to increase his lymphatic flow. *Id.*

On July 12, 2013, state agency consultant Michael Hammonds, Ph. D. ("Dr. Hammonds"), assessed the same level of restriction and limitations as Dr. Price. *See* Tr. at 134–37 and 140–42.

On July 16, 2013, Claimant reported some depression and indicated he tired easily. Tr. at 753. He admitted he was drinking occasionally. *Id.* He stated he continued to experience pain and swelling in his foot as a result of an injury that occurred three weeks prior. *Id.* Ms. Arthur-Banning observed Claimant to have wheezing and decreased breath sounds, but she noted no edema and no musculoskeletal abnormalities. Tr. at 754. She advised Claimant to quit smoking and discussed the effect of alcohol use on his medications. *Id.* She placed a splint on Claimant's toe and instructed him to use a rocker boot. *Id.*

On July 17, 2013, state agency medical consultant Lina B. Caldwell, M.D. ("Dr. Caldwell"), opined that Claimant had no exertional limitations. Tr. at 138. She indicated Claimant should avoid concentrated exposure to hazards and respiratory irritants. Tr. at 139.

On August 8, 2013, Claimant reported a lesion below his left eye, shortness of breath with exertion, and right ankle pain that caused him to fear that his ankle would "give out." Tr. at 744. He requested a handicapped placard be reauthorized. *Id.* Ms. Reynolds observed Claimant to have pitting edema. Tr. at 745. She referred him to an orthopedist, prescribed compression hose, scheduled a lesion removal, and advised him to follow up with his urologist. *Id.*

Claimant presented to R. Brent Bridwell, M.D. ("Dr. Bridwell"), for bilateral ankle pain on August 23, 2013. Tr. at 749. Dr. Bridwell observed Claimant to have significant lymphedema in his bilateral legs that was more severe in his right leg than his left. *Id.* Claimant indicated his pain presented intermittently and was exacerbated by walking and weight bearing. *Id.* Dr. Bridwell noted Claimant demonstrated weakness with eversion, inversion, and dorsiflexion. *Id.* He stated Claimant's ROM was restricted by the swelling in his ankle. *Id.* He observed the x-rays to be negative for any acute fracture or dislocation. *Id.* He indicated he believed that most of Claimant's pain was coming from his "significant ankle swelling and lymphedema." *Id.* He advised Claimant to continue to follow up with the Lymphedema Clinic. Tr. at 749–50.

Claimant presented to Ravi T. Chandran, M.D. ("Dr. Chandran"),[2] for an initial visit on September 9, 2013. Tr. at 656. He complained of a cough, dyspnea with exertion, and nasal sinus drainage. *Id.* He denied wheezing, orthopnea, chest pain, fever, and edema. *Id.* Dr. Chandran observed Claimant to appear well; to have normal mental status; to demonstrate normal respiratory effort; to have normal breath sounds without wheezing; to have a normal heart rate and rhythm; to have no leg or pedal edema; and to demonstrate normal muscle strength and ROM of the spine. Tr. at 657–58. He assessed shortness of breath, allergic rhinitis, and tobacco abuse and referred Claimant for pulmonary function studies. Tr. at 658. On September 16, 2013, pulmonary function testing showed Claimant to have a mild restrictive defect. Tr. at 613.

Claimant denied expectoration, pleuritic pain, fever, pedal edema, nasal congestion, and changes in shortness of breath and cough on September 23, 2013. Tr. at 652. Dr. Chandran indicated Claimant appeared well; had normal breath sounds and respiratory effort; had no edema in his legs or feet; and demonstrated normal heart rate and rhythm. Tr. *at* 653. He assessed cough, allergic rhinitis, lung nodule, and tobacco abuse. *Id.* He advised Claimant to follow up in four months and counseled him to stop smoking. *Id.*

On October 1, 2013, Claimant denied expectoration, pleuritic pain, fever, pedal edema, nasal congestion, and changes in shortness of breath or cough. Tr. at 649. Dr. Chandran observed Claimant to appear well; to be appropriately oriented; to have a

---

[2] Dr. Chandran's records indicate he is board certified in pulmonary, critical care, sleep, and internal medicine. Tr. at 656.

normal affect; to have intact recent and remote memory; to demonstrate normal respiratory effort and breath sounds; to have a normal heart rate and rhythm; to demonstrate normal muscle strength; and to have normal ROM of his neck, thoracic spine, and lumbar spine. Tr. at 650. He recommended Claimant discontinue use of Lisinopril because of his cough. *Id.* He referred Claimant for an additional chest CT scan and advised him to stop smoking. *Id.*

On October 2, 2013, Claimant reported feeling restless, nervous, anxious, fearful, highly irritable, and hypersensitive. Tr. at 718. Ms. Arthur-Banning increased Claimant's dosage of Risperdal for anxiety. Tr. at 719.

On November 11, 2013, Claimant requested an excuse for jury duty. Tr. at 711. He complained that his eyes were burning and watering and that his back was aching. *Id.* Ms. Reynolds observed Claimant to have pitting edema and a muscle spasm in his middle back in the left paraspinal region. Tr. at 712. She agreed to provide Claimant an excuse for jury duty and recommended he lose weight and stop smoking. *Id.* She prescribed Acular for Claimant's eyes and Naprosyn for his back pain. Tr. at 713.

Claimant reported dizzy spells and back pain on December 13, 2013. Tr. at 706. Ms. Reynolds observed Claimant to have a muscle spasm in the middle of his back, but to have no other abnormalities on examination. Tr. at 706–07. She prescribed Flexeril for muscle spasms. Tr. at 708.

Claimant presented to Ms. Reynolds on January 6, 2014, with complaints of nasal discharge and post-nasal drip. Tr. at 697. He requested that Ms. Reynolds complete disability paperwork. *Id.* Ms. Reynolds observed Claimant to be oriented to time, place,

and person; to be in no acute distress; to have nasal discharge; to have clear lungs; to have normal heart rate and rhythm; to demonstrate no edema; and to have normal musculoskeletal strength and ROM. Tr. at 698. She agreed to complete the disability paperwork and advised Claimant to continue his current medications, to stop smoking, and to call if his symptoms worsened. *Id.*

Ms. Reynolds indicated in an RFC questionnaire that she had seen Claimant approximately once a month since June 2012. Tr. at 602. She stated Claimant's diagnoses were social phobia, venous insufficiency, hypertension, depression, anxiety, and bipolar disorder. *Id.* She indicated Claimant experienced edema and joint pain and that his symptoms were constantly severe enough to interfere with the attention and concentration required to perform simple work-related tasks. *Id.* She stated Claimant experienced drowsiness as a side effect of his medications. *Id.* She indicated Claimant would not require the ability to recline or lie down outside of normal break periods during an eight-hour workday. *Id.* Ms. Reynolds estimated Claimant could walk for two blocks, sit for 60 minutes, and stand/walk for 10 minutes at a time. *Id.* She stated Claimant could sit for two hours and stand/walk for one hour in an eight-hour workday. *Id.* She indicated Claimant would require the ability to shift at will from sitting, standing, or walking. *Id.* She stated Claimant would require unscheduled 15- to 30-minute breaks every two to three hours. *Id.* She estimated Claimant could frequently lift 10 pounds or less and could occasionally lift 20 pounds. Tr. at 603. She indicated Claimant was not limited in his ability to perform repetitive reaching, handling, or fingering. *Id.* However, she indicated Claimant could use his hands to grasp, turn, or twist objects for 20% of an eight-hour

workday; could use his fingers for fine manipulation for 10% of an eight-hour workday; and could use his arms for reaching for 20% of an eight-hour workday. *Id.* She estimated Claimant would be absent from work more than four times per month because of his impairments or treatment. *Id.* She denied that Claimant was a malingerer and stated his impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. *Id.* Finally, she indicated Claimant was incapable of working an eight-hour day and five-day workweek on a sustained basis. *Id.*

Ms. Reynolds also completed a mental capacity assessment. Tr. at 604–06. She stated Claimant was extremely impaired in his abilities to remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace with a standard number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. *Id.* Ms. Reynolds stated "[p]atient's social anxiety & depressive episodes make him highly incapable of interacting with the public." Tr. at 605. She indicated Claimant was "easily upset by change." Tr. at 606.

On May 12, 2014, Claimant reported sinus symptoms and requested that Ms. Reynolds provide a medical authorization for him to bring a portable fan on a cruise ship. Tr. at 676. Ms. Reynolds prescribed Bactrim-DS for a sinus infection and wrote a note authorizing Claimant to use a fan on the cruise ship. Tr. at 678.

On June 30, 2014, Claimant presented to Dr. Chandran for follow up. Tr. at 645. He denied pedal edema and expectoration and indicated his shortness of breath and cough were unchanged. *Id.* Dr. Chandran observed Claimant to appear well; to be appropriately oriented; to have a normal affect; to have intact recent and remote memory; to demonstrate normal breath sounds without wheezing; to have a normal heart rate and rhythm; to show no edema; and to demonstrate normal musculoskeletal strength and ROM. Tr. at 642. He assessed a solitary lung nodule, acute bronchitis, allergic rhinitis, and a mild pulmonary restrictive defect. *Id.* He assured Claimant that the lung nodule was stable and counseled him to stop smoking. *Id.*

Claimant complained of lesions on his arms and a one-month history of fecal incontinence on August 21, 2014. Tr. at 661 and 662. Ms. Reynolds observed Claimant to be appropriately oriented and in no acute distress. Tr. at 662. She noted Claimant had actinic keratosis on his bilateral lower arms and pitting edema. *Id.* She referred Claimant for a colonoscopy. Tr. at 663.

Ms. Reynolds completed a second RFC questionnaire on September 15, 2014. Tr. at 758–59. She offered the same impressions that she gave in her January 2014 RFC assessment, except that she indicated Claimant had limitations in doing repetitive reaching, handling, or fingering. *Compare* Tr. at 602–03, *with* Tr. at 758–59. She further

indicated she had treated Claimant since June 11, 2012, and that his limitations and restrictions had been consistent with those indicated in the RFC questionnaire since that date. Tr. at 760.

Ms. Reynolds completed a third RFC questionnaire on October 16, 2014. Tr. at 762–63. She indicated Claimant had additional side effects from use of medications that included dizziness and possible nausea and vomiting. Tr. at 762. She stated Claimant would need to lie down or recline during breaks that would exceed the typical number of breaks provided by an employer. *Id.* She estimated Claimant could walk for one block, sit for 20 minutes, and stand for 20 minutes at a time. *Id.* She stated Claimant could sit for one to two hours and stand for one to two hours during an eight-hour workday. *Id.* She indicated Claimant would need a 10- to 15-minute break each hour. *Id.* She stated Claimant could perform no frequent lifting and could occasionally lift 10 pounds or less. Tr. at 763. She indicated Claimant would be absent from work three or four times per month. *Id.*

Claimant complained of sinus-related symptoms on October 28, 2014. Tr. at 773. Ms. Reynolds observed Claimant to have an accumulation of purulent mucous in his pharynx and mild pitting edema. Tr. at 774. She advised Claimant to discontinue smoking and drinking a six-pack of Pepsi each day. *Id.*

Claimant underwent a colonoscopy on October 31, 2014, that revealed diverticular disease and internal hemorrhoids. Tr. at 765.

During a follow up visit with Dr. Chandran on November 5, 2014, Claimant denied any changes. Tr. at 794. Dr. Chandran observed no abnormalities on physical

examination. Tr. at 795. He advised Claimant to quit smoking and instructed him to obtain a new chest CT scan and pulmonary function tests. *Id.*

On February 6, 2015, Ms. Reynolds encouraged Claimant to modify his dietary and exercise routines in order to lose weight. Tr. at 767.

Pulmonary function studies revealed mild restrictive defect, mildly increased air resistance, and mildly impaired diffusion capacity on February 10, 2015. Tr. at 800.

Claimant denied pulmonary changes on February 20, 2015. Tr. at 797. Dr. Chandran observed Claimant to appear well; to have normal mental status; to have no respiratory abnormalities; to have no edema or other cardiovascular abnormalities; to have normal muscle strength; to demonstrate normal spinal ROM; and to have a normal neurological examination. Tr. at 798. He prescribed Augmentin for bronchitis and indicated a need to compare the most recent chest CT with the prior scan. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Claimant's Testimony

At the hearing on December 18, 2014, the ALJ noted that Claimant was in a wheelchair. Tr. at 53. He asked Claimant if he was able to walk and Claimant confirmed that he could walk short distances. *Id.* He stated he used a cane and a walker, in addition to the wheelchair. Tr. at 74.

Claimant testified that he had stopped working because he was experiencing migraines. Tr. at 61. He indicated he was unable to work because he could not stand in one place for too long. Tr. at 63. He stated that he had developed edema and that his legs

would "give out." *Id.* He indicated he had difficulty walking when his legs were swollen, but he denied wearing compression hose on a daily basis. Tr. at 64 and 74. He estimated he experienced edema in his legs once a month and that it lasted from one day to two weeks at a time. Tr. at 73. The ALJ asked "[w]hat if we got you a sit down job? You didn't have to stand." Tr. at 63. Claimant stated "I guess that could work." *Id.* He indicated he could stand for five minutes, walk for two to three minutes, and sit for 30 minutes at a time. Tr. at 71. He estimated he could lift "[n]o more than five to 10 pounds." *Id.* He indicated he had problems with his knees that affected his ability to bend. Tr. at 72. He stated he no longer had sufficient strength to cut meat. Tr. at 75.

Claimant testified that his ability to work was affected by bipolar disorder, anxiety, and emphysema. Tr. at 64. He indicated he used an inhaler, but did not use oxygen. *Id.* He confirmed that he continued to smoke. Tr. at 72. He stated he experienced pain in his legs that lasted from one to four hours per day. Tr. at 65. He indicated his pain was reduced by sitting. *Id.* He stated his medication was effective and denied side effects. Tr. at 70–71. He indicated his anxiety caused him to sweat, twitch, and feel jumpy. Tr. at 76. However, he stated his anxiety-related symptoms had "calmed down a lot" since he had started taking medication. *Id.* He indicated he experienced symptoms of anxiety for five to 10 minutes every other day. Tr. at 77.

Claimant testified that he lived with his wife and eight-year-old daughter. Tr. at 56–57. He indicated he had renewed his commercial driver's license during the prior year, but no longer drove. Tr. at 58–59. He stated he had been incarcerated six months earlier for assaulting a police officer with a door. Tr. at 59. He testified he spent most of

his time sleeping and sitting in a chair. Tr. at 66–67. He indicated he typically slept from 9:00 or 10:00 p.m. until 12:00 p.m. Tr. at 77. He stated he watched very little television. Tr. at 66. However, he indicated he enjoyed watching football and was able to watch an entire game if he was interested in the team. Tr. at 76. He denied reading, cooking, and cutting grass. Tr. at 66, 67, and 68. He indicated he was able to bathe and dress on his own and that he sometimes used a leaf blower in his yard. Tr. at 67. He denied doing laundry and going shopping, but indicated he sometimes helped his wife to pick up items in the living room. Tr. at 68. He indicated he had driven to Port Canaveral to board the ship and had taken a week-long cruise with his family members during the prior June. Tr. at 68–69. He stated he went out for meals, socialized with family members "[e]very so often," and occasionally attended church. Tr. at 69. He indicated he used a computer to access Facebook. *Id.*

### b. Vocational Expert Testimony

Vocational Expert ("VE") Karl Weldon reviewed the record and testified at the hearing. Tr. at 78. The VE categorized Claimant's PRW as a meat cutter, *Dictionary of Occupational Titles* ("*DOT*") number 521.685-098, as requiring heavy exertion and having a specific vocational preparation ("SVP") of six and a stocker, *DOT* number 299.367-014, as requiring medium exertion with an SVP of four. Tr. at 80. The ALJ described a hypothetical individual of Claimant's vocational profile who was limited to frequent exposure to environmental irritants such as fumes, odors, dust, and gases; frequent use of moving machinery; frequent exposure to unprotected heights; and simple, routine, and repetitive tasks in a work environment free of fast-paced production

requirements that involved only simple work-related decisions and few, if any, workplace changes; no interaction with the public; and only occasional interaction with coworkers. Tr. at 80–81. The VE testified that the hypothetical individual would be unable to perform Claimant's PRW. Tr. at 81. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified medium jobs with an SVP of two as an order picker, *DOT* number 922.687-058, with 2,200 positions in the regional economy and 326,000 positions in the national economy; a warehouse worker, *DOT* number 922.687-058, with 3,900 positions in the regional economy and 524,000 positions nationally; and a hand packer, *DOT* number 920.587-018, with 3,100 positions in the regional economy and 699,000 positions in the national economy. Tr. at 81–82.

The ALJ next described a hypothetical individual of Claimant's vocational profile who was limited to light work; could lift up to 20 pounds occasionally and 10 pounds frequently; could stand and walk for approximately two hours in an eight-hour workday; could sit for approximately six hours in an eight-hour workday; could never climb ladders, ropes, scaffolds, ramps, or stairs; could frequently balance with a hand-held assistive device; could occasionally stoop; could never crouch, kneel, or crawl; was limited to frequent exposure to environmental irritants such as fumes, odors, dust, and gases; was limited to frequent use of moving machinery; was limited to no exposure to unprotected heights; was limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements that involved only simple work-related decisions and few, if any, workplace changes; and with no interaction with the

26

public and only occasional interaction with coworkers. Tr. at 82–83. The VE testified that the individual could perform light jobs with an SVP of two as a sorter, *DOT* number 789.687-146, with 1,200 positions in the regional economy and 220,000 positions in the national economy; a hand packer, *DOT* number 753.687-038, with 1,900 positions in the regional economy and 522,000 positions in the national economy; and an inspector, *DOT* number 741.687-010, with 2,100 positions in the regional economy and 432,000 positions in the national economy. Tr. at 83.

The ALJ asked the VE if there were light jobs that would allow an individual to sit for eight hours during an eight-hour workday. Tr. at 83 and 84. The VE testified that the individual could perform the jobs identified in response to the last hypothetical question, but that the number of jobs would be reduced to only 10 percent of the original numbers. Tr. at 84. He indicated there would be 120 sorting jobs in the regional economy and 22,000 in the national economy; 190 hand packaging jobs in the regional economy and 52,200 in the national economy; and 210 inspecting jobs in the regional economy and 43,200 in the national economy. *Id.*

The ALJ asked the VE to consider a hypothetical individual of Claimant's vocational profile who was limited to sedentary work; could lift up to 10 pounds occasionally; could sit for eight hours out of an eight-hour workday; and would not be required to engage in standing and walking. Tr. at 85. He asked if there would be any jobs for an individual with those limitations. *Id.* The VE testified the individual could perform jobs as an assembler, *DOT* number 739.684-094, with 1,100 positions in the regional economy and 288,000 positions nationally; an inspector, *DOT* number 726.684-

050, with 1,800 jobs in the regional economy and 362,000 positions nationally; and a sorter, *DOT* number 521.687-086, with 2,800 positions in the regional economy and 362,000 positions in the national economy. *Id.*

The ALJ asked the VE to consider a hypothetical individual of Claimant's vocational profile who was limited as described in the last hypothetical question, but was unable to engage in sustained work activity for a full eight-hour workday on a regular and consistent basis. Tr. at 86. He asked if there would be jobs available for an individual with those limitations. *Id.* The VE stated there would be no work available. *Id.*

### 2. The ALJ's Findings

In his decision dated February 10, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.
2. The claimant has not engaged in substantial gainful activity since January 31, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. The claimant has the following severe impairments: emphysema; edemas; and affective disorders (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he can lift up to twenty pounds occasionally and ten pounds frequently; while he cannot stand or walk for any significant period of time, he can sit eight hours in an eight-hour workday, with normal breaks; he can never climb ladders, ropes, scaffolds, ramps, or stairs; he can frequently balance with a hand-held assistive device; occasionally stoop, but never crouch, kneel, or crawl; he can never be exposed to environmental irritants, such as fumes, odors, dusts, and gases; he can frequently use moving machinery and there must be no

exposure to unprotected heights; with his work being limited to simple, routine, repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only simple, work-relate[d] decisions, and few, if any, workplace changes.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on February 20, 1966 and was 45 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 30–43.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ assessed an RFC that was contradictory and did not allow for performance of substantial gainful activity; and

2)    the ALJ did not adequately assess Claimant's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

"disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last for
> at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

(discussing considerations and noting "need for efficiency" in considering disability

claims). An examiner must consider the following: (1) whether the claimant is engaged

in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[3] (4) whether such

_____

[3] The Commissioner's regulations include an extensive list of impairments ("the
Listings" or "Listed impairments") the Agency considers disabling without the need to
assess whether there are any jobs a claimant could do. The Agency considers the Listed
impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to
prevent all gainful activity. 20 C.F.R. § 404.1525 and § 416.925. If the medical evidence
shows a claimant meets or equals all criteria of any of the Listed impairments for at least
one year, he will be found disabled without further assessment. 20 C.F.R. §
404.1520(a)(4)(iii) and § 416.920(a)(4)(iii). To meet or equal one of these Listings, the
claimant must establish that his impairments match several specific criteria or are "at
least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526 and §
416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S.

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520 and § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b) and § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h) and § 416.920(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.     Analysis

        1.     RFC Assessment and Step Five Determination

Plaintiff argues the limitation in the RFC assessment to work that did not involve standing or walking for a significant period conflicted with the restriction to light work. [ECF No. 14 at 11]. She maintains the RFC did not allow for sedentary work because sedentary work requires occasional standing and walking. *Id.* She contends the ALJ did not question the VE regarding the vocational implications of the non-exertional limitations he included in the RFC assessment. *Id.* at 12. She claims the ALJ restricted Claimant to no exposure to environmental irritants in the decision, but indicated in the hypothetical question to the VE that the hypothetical individual was limited to frequent exposure to environmental irritants. [ECF No. 16 at 1–2].

The Commissioner argues the VE's testimony confirms that the assessed RFC allowed for the performance of jobs. [ECF No. 15 at 14]. She maintains the VE considered the non-exertional limitations in determining the number of jobs that would allow for the restrictions included in the RFC assessment. *Id.* at 15. She contends the ALJ did not strictly rely on the regulatory definitions of sedentary and light work, but instead consulted a VE to confirm the existence of jobs. *Id.* at 16–18. She further maintains that omission of a restriction on exposure to environmental irritants was inconsequential

because the VE identified jobs that the *DOT* described as requiring no exposure to environmental irritants. [ECF No. 18 at 1–2].

At step five of the sequential evaluation process, the Commissioner bears the burden of showing that the economy contains a significant number of jobs that the claimant can perform. *Walls*, 296 F.3d at 290. The provisions of 20 C.F.R. § 404.1566(d) and § 416.966(d) provide that the ALJ should take administrative notice of job information contained in the *DOT*. Pursuant to SSR 00-4p, ALJs should "rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy."

In some cases, ALJs call upon the services of VEs to address how certain restrictions affect claimants' abilities to perform specific jobs. 20 C.F.R. § 404.1566(e) and § 416.966(e); *see also Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). For a VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). ALJs have discretion in framing hypothetical questions, but the limitations included in the hypothetical questions must be supported by the record. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979). A VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See id.*

Pertinent to Plaintiff's argument, the ALJ determined that Claimant had the RFC "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)." Tr. at 32. He found that Claimant could lift up to 20 pounds occasionally and 10 pounds frequently, could not "stand or walk for any significant period of time," and could "sit eight hours in an eight-hour workday, with normal breaks." *Id.* He stated Claimant could "never be exposed to environmental irritants, such as fumes, odors, dusts, and gases." Tr. at 32. He indicated Claimant was "limited to simple, routine, repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only simple, work-relate[d] decisions, and few, if any, workplace changes." *Id.* He found that Claimant could perform light and unskilled jobs as an order sorter, a hand packager, and an inspector. Tr. at 42. He identified the reduced numbers the VE provided in his testimony and stated the VE's testimony was consistent with the *DOT*. *Id.*

Plaintiff argues that the ALJ's finding that Claimant could perform light work that involved lifting up to 20 pounds occasionally and up to 10 pounds frequently and sitting for eight hours in an eight-hour workday was inconsistent with the performance of light or sedentary work. However, because the ALJ found that Claimant was capable of performing light work and identified jobs that the *DOT* classified as being performed at the light exertional level, the undersigned has only considered whether the assessed RFC was consistent with the performance of light work.

Light work is defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), as involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds and requiring either a good deal of walking or standing or

sitting most of the time with some pushing and pulling of arm or leg controls. An individual "must have the ability to do substantially all" of the activities required for light work." 20 C.F.R. § 404.1567(b) and 416.967(b). "Relatively few unskilled light jobs are performed in a seated position." SSR 83-10, 1983 WL 31251, at *5.

The ALJ's finding that Claimant could perform light work was not inherently inconsistent with his finding that Claimant was required to sit for eight hours in an eight-hour workday, with normal breaks. He did not include any restrictions in the RFC assessment on Claimant's abilities to push or pull arm or leg controls other than the weight limits consistent with light exertional activity. Thus, the ALJ found that Claimant could perform that segment of light work that "involves sitting most of the time with some pushing and pulling of arm or leg controls." *See* 20 C.F.R. § 404.1567(b) and §416.967(b).

In light of specific language in SSR 83-10 and 20 C.F.R. § 404.1567(b) and § 416.967(b), it was necessary for the ALJ to consult a VE to determine the implication of the limitation to sitting for eight hours per day. *See Landrum v. Astrue*, No. 08-2678-TLW-JRM, 2010 WL 558599, at *7 (D.S.C. Feb. 10, 2010) ("When a claimant: (1) suffers from a nonexertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional limitation which restricts him from performing the full range of activity covered by a work category, the ALJ may not rely on the Grids and must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant."), citing *Walker*, 889 F.2d at 49. Thus, the ALJ fulfilled his duty to consult a VE to obtain specific information

regarding the number of jobs that would be available to an individual with the limitations he assessed for Claimant. The VE testified that the number of available order sorter, hand packager, and inspector jobs would be eroded to 10 percent of the original number if the individual were required to sit for eight hours during an eight-hour workday, but that jobs still existed. *See* Tr. at 84. The ALJ relied on the VE's testimony to find that the jobs of order sorter, hand packager, and inspector existed in significant numbers in the national economy, despite the erosion of the total number of positions based on the eight-hour sitting requirement. *See* Tr. at 42.

Furthermore, as Plaintiff acknowledged [ECF No. 14 at 12], it was necessary for the ALJ to obtain testimony from a VE to determine the extent to which the light occupational base was eroded by Claimant's mental, environmental, and other non-exertional limitations.

The RFC the ALJ assessed in the decision mirrored his hypothetical question to the VE during the hearing, except that he indicated in the hypothetical question that the individual was limited to frequent exposure to environmental irritants, but found in his decision that Claimant could "never be exposed to environmental irritants."[5] *Compare* Tr. at 32, *with* Tr. at 82–83 and 84. The relevant regulations and SSRs provide that the *DOT* is the primary source for information regarding the requirements for specific jobs. *See* 20 C.F.R. § 404.1566(d) and § 416.966(d); SSR 00-4p. The *DOT*'s descriptions of the identified jobs indicate "Not Present—Activity or condition does not exist" with respect

_____

[5] The hypothetical question also included restrictions for no interaction with the public and only occasional interaction with coworkers, but the ALJ did not include those limitations in the assessed RFC. *Compare* Tr. at 32, *with* Tr. at 83.

to "Toxic Caustic Chem." and "Other Env. Cond." *See* 789.687-146[6] REMNANT SORTER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 681286; 753.687-038 PACKING LINE WORKER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 680354; 741.687-010 PAINT-SPRAY INSPECTOR. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 680249. Although the ALJ concluded the VE's testimony was consistent with the information contained in the *DOT* (Tr. at 42), he was not prohibited from including in his RFC assessment a more stringent environmental restriction where a plain reading of the *DOT*'s descriptions of the jobs identified by the VE showed the additional restriction to be inconsequential. Thus, it does not appear that the ALJ erred in including a more stringent restriction for environmental irritants in the RFC assessment than he included in the hypothetical question he presented to the VE and relied on to produce evidence of jobs existing in significant numbers. However, even if the ALJ erred in assessing an RFC that differed from his hypothetical question to the VE, his error was harmless because the VE would have relied on the *DOT* to find Claimant could perform the same jobs even if he could never be exposed to environmental irritants. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994)

---

[6] The undersigned notes that the ALJ cited an incorrect *DOT* number for the "sorter" position. *See* Tr. at 42. In light of the ALJ's finding that Claimant could perform the job of "order sorter" and his citation of the number of jobs the VE identified for sorter positions, the undersigned concludes that the ALJ committed a scrivener's error and meant to refer to *DOT* number 789.687-146, which was cited by the VE in his testimony. *See generally Jenkins v. Commissioner of Social Security Administration*, No. 1:16-1237-RMG-SVH, 2017 WL 1034623, at *11 (D.S.C. Mar. 2, 2017) (explaining that a harmless scrivener's error may be found if a review of the entire decision remedies the error), adopted by 2017 WL 1040365 (D.S.C. Mar. 16, 2017).

(providing that the court has traditionally excused errors as harmless in cases where the ALJ "would have reached the same result notwithstanding" the error).

To the extent that Plaintiff argues SSR 85-15[7] suggests Claimant was unable to perform any jobs, the undersigned rejects this argument. Although SSR 85-15 provides that the potential occupational base would be "severely limit[ed]" by "[a] substantial loss of ability" to "understand, carry out and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting," it does not explain what would be considered a "substantial loss of ability" or provide how it would "severely limit" the occupational base. SSR 85-15, 1985 WL 56857, at *4. The SSRs provide that ALJs should consult VEs to determine the implications of non-exertional limitations in complex situations. *See* SSR 83-14, 1983 WL 31254, at *4 and SSR 85-15, 1985 WL 56857, at *3. Therefore, the ALJ followed the directive of the SSRs in soliciting testimony from a VE to determine the effects of the assessed mental restrictions. He then relied on the VE's opinion to find that the mental restrictions set forth in the RFC assessment would allow for the performance of a significant number of jobs.

Although Plaintiff presented no specific argument regarding conflicts between the *DOT* and the VE's testimony, in reviewing the identified jobs in the *DOT*, the undersigned noted conflicts between the *DOT*'s description of the job of "remnant sorter" and the VE's testimony. The ALJ assessed an RFC that limited Claimant to occasional

---

[7] The undersigned notes that SSR 85-15 provides a framework for evaluating solely non-exertional impairments. Because the ALJ assessed Claimant to have a combination of exertional and non-exertional impairments, SSR 83-14 was applicable. *See* Tr. at 32.

stooping and no crouching (Tr. at 32), but the remnant sorter position is described as requiring frequent stooping and crouching. *See* 789.687-146 REMNANT SORTER. *Dictionary of Occupational Titles* (4th ed., revised 1991). The ALJ erred in relying on the VE's testimony that Claimant could perform the "remnant sorter" position without having identified and resolved the conflict between the VE's testimony and the *DOT*'s description of the job. *See Pearson v. Colvin*, 810 F.3d 204, 208 (4th Cir. 2015); SSR 00-4p. In light of the recommendation below, the ALJ should identify and resolve conflicts between VE testimony and the *DOT* on remand.

### 2.     Credibility Assessment

Plaintiff argues the ALJ did not cite valid reasons for discrediting Claimant's statements. [ECF No. 14 at 13–14]. She maintains the ALJ erred in assessing the effects of pain and other symptoms on Claimant's RFC because he did not adequately consider Claimant's edema; failed to cite to the allegations in Claimant's second function report; and drew improper inferences based on the sudden onset of Claimant's mental symptoms and the fact that he went on a cruise. [ECF No. 14 at 13–16].

The Commissioner argues the ALJ relied on normal examination findings and Claimant's testimony that he could perform sedentary work in assessing his RFC. [ECF No. 15 at 20–21]. She maintains the ALJ also reasonably relied on Claimant's reported ADLs and social interactions. *Id.* at 21–22.

In considering a claimant's allegations of pain or other symptoms, the ALJ should first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical

and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p.[8] After determining that the claimant has a medically-determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the limitations they impose on his ability to do basic work activities. *Id.* If the claimant's statements about the intensity, persistence, or limiting effects of his symptoms are not substantiated by the objective medical evidence, the ALJ must consider his credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the claimant's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the following:

1.    The individual's ADLs;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

---

[8] The Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, the court analyzes the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility. Although SSR 16-3p eliminates the assessment of credibility, it requires assessment of most of the same factors to be considered under SSR 96-7p.

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3).

The ALJ must support his cite specific evidence in the case record to support his credibility finding. *Id.* He must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.*

In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations to the other evidence in the record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

In view of the foregoing authority, the undersigned has considered Plaintiff's specific allegations of error.

a.    Lower Extremity Edema

Plaintiff argues the ALJ misstated the evidence of record regarding Claimant's lower extremity edema. [ECF No. 14 at 13–14].

The ALJ stated that the medical evidence showed Claimant to have edema in his bilateral ankles and feet. Tr. at 36. He concluded Claimant's edema could "directly affect" his "ability to perform work-related functions, such as standing and walking." *Id.* He stated the combined effects of obesity, edema, and emphysema limited Claimant's capabilities. *Id.* He indicated that Claimant's "edema was never noted to be more than mild" after he started taking medication. *Id.* He stated "[m]ultiple cardiovascular studies revealed little ischemia and showed no significant problem." Tr. at 36–37. He stated Ms. Reynolds's "opinion of constant edema in the legs is contradicted by her own treatment notes most often reflecting no edema." Tr. at 37. He indicated Claimant's edema "sometimes emerged," but was "managed with medication." *Id.* Finally, he noted "[w]hen asked directly, the claimant testified that he guessed he could work at sit-down job." Tr. at 41.

A review of the record shows that Claimant initially reported lower extremity edema on January 21, 2013, and continued to show signs of the impairment during treatment visits between January and August 2013. Tr. at 418, 420–21, 503, 504, 535, 537, 557, 574, 583, 584, 614, 745, and 749. He received prescriptions for Lasix and compression hose and underwent treatment at the Lymphedema Clinic. Tr. at 507, 614–19, 745, and 749–50. Although Claimant had evidence of some edema on November 11, 2013 (Tr. at 712), August 21, 2014 (Tr. at 662), and October 28, 2014 (Tr. at 774), the

majority of the records after August 2013 indicate the absence of lower extremity edema. *See* Tr. at 657 (observing no evidence of edema on September 9, 2013), 653 (documenting no edema on September 23, 2013), 649 (denying edema on October 1, 2013), 707 (indicating no edema present on December 13, 2013), 698 (finding no edema on January 6, 2014), 677 (observing no edema on May 12, 2014), 642 (noting no leg edema or pedal edema on June 30, 2014), and 795 (indicating the absence of pedal and leg edema on November 5, 2014). Claimant's testimony also reflected that he experienced edema intermittently. *See* Tr. at 73 and 74. Thus, the ALJ's evaluation of the evidence is generally consistent with the record.

Furthermore, the ALJ credited and accommodated Claimant's edema by finding that his RFC did not allow him to stand or walk for any significant period of time and that he could sit for eight hours in an eight-hour workday, with normal breaks. *See* Tr. at 32 and 36. He also imposed limitations to Claimant's abilities to climb, balance, stoop, and crouch based on the combined effects of obesity, edema, and emphysema. *See* Tr. at 36. The restrictions the ALJ imposed were consistent with Claimant's testimony that his edema prevented him from engaging in prolonged walking and standing in one place for an extended period. Tr. at 63 and 73–74. In addition, as the ALJ noted in his decision, the restrictions were consistent with Claimant's testimony that he could perform "a sit down job." *See* Tr. at 63. In light of the ALJ's assessment and in the absence of any specific argument from Plaintiff as to how Claimant's edema imposed additional limitations, the undersigned recommends the court find the ALJ adequately considered the record in determining the functional effects of Claimant's edema.

b.    Second Function Report

Plaintiff argues the ALJ did not adequately assess Claimant's credibility because he cited only to the first function report and failed to acknowledge Claimant's allegations in the second function report. [ECF No. 14 at 14]. She maintains that Claimant alleged in the second function report that he needed help with bathing and dressing; was unable to cook because of difficulty standing and concentrating; was unable to do yardwork because of difficulty standing; was unable to drive because he "ends up lost"; and did not spend time with other people or go out." *Id.*

The Fourth Circuit has expressly rejected the argument that an ALJ's decision must address every piece of evidence. "While the Commissioner's decision must 'contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reasons upon which it is based,' 42 U.S.C. § 405(b)(1), 'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.'" *Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014), citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam); *Russell v. Chater*, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (per curiam) (explaining that the court has not "establish[ed] an inflexible rule requiring an exhaustive point-by-point discussion in all cases").

Although the ALJ did not specifically reference the second function report, he indicated he based his decision on a review of the entire record. Tr. at 30 and 32. "Absent evidence to the contrary," the court is to accept the ALJ's indication that he considered the entire record. *Reid*, 769 F.3d at 865, citing *Hackett v. Barnhart*, 395 F.3d 1168, 1173

(10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

Plaintiff argues that the second function report shows Claimant's activities to have been reduced by the development of physical impairments. [ECF No. 14 at 14]. While the ALJ did not reference Claimant's indications in the second function report that he had difficulty standing to cook and perform yardwork, he credited Claimant's general allegations of difficulty standing by assessing an RFC that specified he could not "stand or walk for any significant period of time." Tr. at 32. Therefore, the undersigned recommends the court find the ALJ did not err in failing specifically cite the additional physical limitations noted in the second function report because a review of the entire record reveals that he credited Claimant's reported limitations.

On the other hand, a review of the entire record does not show that the ALJ adequately credited the mental limitations Claimant reported in the second function report. The ALJ stated that he credited Claimant's general allegations of impaired concentration, difficulty handling stress, and problems dealing with other people by limiting him "to non-complex tasks, free of fast-paced production, simple decisions, no interaction with the public, and occasional interaction with coworkers." Tr. at 38. Despite the ALJ's statement in the decision (Tr. at 38) and his inclusion of restrictions for no interaction with the public and only occasional interaction with coworkers in the hypothetical questions he presented to the VE (Tr. at 82–83 and 84), a review of the assessed RFC does not show that the ALJ included restrictions that pertained to Claimant's abilities to interact with the public and coworkers. *Compare* Tr. at 32, *with* Tr.

at 38. Nevertheless, the ALJ cited jobs the VE identified as requiring no interaction with the public and only occasional interaction with coworkers at step five. *See* Tr. at 42. Thus, the error might be deemed harmless because the ALJ would have reached the same conclusion notwithstanding the error, *Mickles*, 29 F.3d at 921, but for the error discussed below.

### c. Evaluation of Mental Impairments

Plaintiff argues the ALJ made an impermissible speculative inference in relying on Claimant's report that he went on a cruise to discredit his allegation that he had difficulty interacting with others. [ECF No. 14 at 14–15]. She maintains that the ALJ was not qualified to interpret the "sudden onset" of Claimant's mental impairment and that the record suggested Claimant had a history of behavior that was consistent with mental impairment. *Id.* at 15–16.

The ALJ stated Claimant's "ability to tolerate other people on a cruise ship" was "inconsistent with h[i]s assertions" that "he cannot tolerate others." Tr. at 40. Because an individual's ADLs and statements are pertinent to the inquiry under SSR 96-7p, it was not unreasonable for the ALJ to consider the fact that Claimant went on a cruise in evaluating the severity of his alleged symptoms. 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3). The ALJ did not question Claimant extensively about his cruise vacation, but he did confirm that Claimant went on a week-long cruise with members of his family, including his mother-in-law. Tr. at 68. Thus, the ALJ received confirmation from Claimant that he was able to tolerate at least his family members, who were "other people" on the ship. In addition, the ALJ did not rely exclusively on Claimant's ability to

47

tolerate others on a cruise ship in assessing his ability to interact socially. He also cited Claimant's ability to maintain a relationship with his wife; his treating physicians' notes that described him as being pleasant and having normal behavior; his past ability to perform a job that required significant interaction with the public; and the absence of observations from treating physicians that confirmed he had "a substantial social impairment." Tr. at 31. Thus, the undersigned recommends the court find the ALJ did not err in considering Claimant's ability to interact with others on a cruise ship as one of several factors that were pertinent to his ability to interact socially.

Despite the foregoing recommendation, Plaintiff presents a persuasive argument with respect to the ALJ's consideration of the onset and history of Claimant's mental impairment. The record contains multiple references to Claimant's difficulties in interacting with members of the public and authority figures prior to and during the relevant period. *See* Tr. at 59 (Claimant testified that he had recently been arrested for assaulting a police officer with a door), 471 (Claimant informed Mr. Cabbage that he had a history of domestic violence ten years earlier, had been arrested twice during the prior year for assaulting a police officer and being verbally abusive to a police officer, and had been arrested in his early twenties for assaulting a woman in a bar), 472 (Claimant reported to Mr. Cabbage that he had almost been involved in a fight, after being harassed by other fans at a professional football game he recently attended), 489 (Claimant informed Dr. Cannon that he had been arrested in the past for criminal domestic violence, breach of peace, and simple assault; had "a bad temper" and would "yell, scream, curse, and throw things" when angry; and "had struck his wife on several occasions"), and 511

48

(Claimant was verbally abusive to hospital staff members).[9] Even though the record contained evidence that Claimant's impairments had affected his ability to interact with others in the past, the ALJ neither recognized the allegations, included restrictions in the assessed RFC to address the purported limitations, nor explained his reasons for declining to impose additional restrictions. *See* Tr. at 32. In light of the foregoing, the undersigned recommends the court find the ALJ did not consider the entire record in assessing Claimant's statements and determining the effects of his impairments.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

---

[9] The record includes references to Claimant's history of alcoholism. *See* Tr. at 471 and 489. Although Claimant reported "he had been totally free from alcohol for 10 years" (Tr. at 489), his wife's report that he had used alcohol as recently as six or seven months prior to the appointment (Tr. at 489), his presentation to the ER on May 31, 2013, with alcohol intoxication (Tr. at 510), and his indication to Ms. Arthur-Banning that he was drinking occasionally (Tr. at 753), suggest Claimant's use of alcohol might have affected his mental impairments. In light of this evidence, the ALJ might consider further exploring whether Claimant's use of alcohol affected his work-related abilities on remand.

IT IS SO RECOMMENDED.

April 25, 2017                              Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).